May it please the court. Performance denied Ms. Wallace the ability to do her job because of her sex. Wallace's supervisor, the person charged with assigning projects, told her she could not work at Elevation because, quote, female stay on the ground. He openly declared in crude terms that Wallace could not do her job because she had, quote, tits and an ass. He admitted at his deposition that he, quote, easily could have used this profane language to tell Wallace that, quote, no female is allowed in the rack. To Performance, because Wallace is a woman, she didn't, quote, count. This is direct evidence of discrimination, like the evidence in, for example, Portis, where a plaintiff was told she wasn't worth as much as men. Performance argues that this intentional discrimination does not violate Title VII, but Title VII prohibits- What's your response to this whole issue of the safety? So this, the purported safety issue, it simply creates a genuine dispute of material fact at this stage, which must be resolved in Ms. Wallace's favor because of the plethora of direct evidence that demonstrates that the restriction on Ms. Wallace's job duties was sex-based. Did other women work at Elevation? There's no evidence in the record that other women worked at Elevation, and indeed, Performance doubles down on the direct evidence of discrimination in their brief at page 16, admitting that there was a policy of not allowing women to work at Elevation. Now, we don't have to change our precedent because, I mean, there's a whole movement to change our precedent about what is an action and doesn't have to be a final act, and that's a whole scholarly debate going on right now, but even under our existing precedent about the detective case and the other, if you can't do something that helps you in your job advancement and it's a different role, that's enough, even under our existing precedent. Is that correct? Can you help me? Help us with that. That's right, Judge Elrod. Under this court's precedent, the sex-based restrictions that were imposed on Ms. Wallace violated Title VII, and the court has repeatedly held in cases like Thompson, which is the detective case that you referenced, and in Sharpe, that a demotion or objectively worse change in responsibilities is an adverse employment action under Title VII. So to be the equivalent of a demotion, and I'm quoting from Sharpe here, a job assignment need not result in a decrease in pay, title, or grade. It can be a demotion if the assignment proves objectively worse, such as being less prestigious or less interesting or providing less room for advancement. So the way we read cases like Thompson and Sharpe is that the restrictions on job responsibilities must be more than a mere loss of some job responsibilities. Instead, there must be some sort of plus factor, something like the loss of essential job functions, the inability to use education or skills acquired, or a less interesting or less prestigious role with less room for advancement. And here, we have plus factors several times over. So first, the restrictions provided Ms. Wallace with less room for advancement, and this is her supervisor's testimony at ROA-564 and ROA-603 that helpers were more valuable assets when they could work at Elevation. So her supervisor, Gautreaux, explained at his deposition that if he had only one slot open and two helpers, one with experience working at Elevation and one without that experience, he would absolutely view the helper with the experience working at Elevation. So if women are blocked from working at Elevation, then women can't move to those opportunities. That's exactly right, Judge Elrod. And the restrictions also effectively demoted Wallace from a helper to a laborer position, which was a less interesting and less prestigious position, which required less experience and fewer skills. So helpers are classified above laborers, and they're supposed to have more job responsibilities, including work at Elevation, and this is ROA-638 and 639. Helpers, they follow craftsmen like pipefitters and welders around the construction site, assisting them where they work, including when they're working at Elevation. And the record demonstrates that performance employees and employees in the construction industry in general learn their craft through on-the-job training, and that's at ROA-466. Whereas laborers, in contrast, they support other employees by doing paperwork and cleaning, and that's at ROA-589. But the record reflects that ROA-592, that Ms. Wallace was demoted to the work of a laborer, that she was required to do the work of an unskilled worker. We had helpers working on the ground level also, didn't you? Helpers did work on the ground, but their work is to follow craftsmen around, both on the ground and at Elevation, whereas laborers are doing unskilled work, not following craftsmen, doing work like paperwork and cleaning. I mean, she wasn't doing helper work, but on the ground, right? She was really doing the work of a laborer, and I'd point you to ROA-592, where her supervisor, Casey, describes how she was doing the work of a laborer, like this paperwork and cleaning. There was overlap between the work that helpers and laborers do, but the restriction on allowing her to work at Elevation effectively demoted her to having the role of a laborer as opposed to a helper. And what also distinguishes this case from situations where restrictions on a job represent just a mere loss of some job responsibilities, and thus don't amount to an adverse employment action, is that she was subject to this discriminatory policy that served as a badge of inferiority. So the stigma from being subject to a facially discriminatory policy that prohibits women from doing these essential job tasks is going to impede opportunities, including economic opportunities, because it could deter women from seeking promotions at performance, or it could drive them off the job altogether. Are you also seeking to preserve for our en banc court the issue of ultimate employment actions in this case, or not? Yes, Your Honor. I mean, we do not believe that this issue has to be taken up by the en banc court in this case, and that's for all of the reasons that we've been discussing, that under the existing precedent, the discrimination that Ms. Wallace experienced here violated Title VII. But we do preserve the point that under Title VII's plain text, the discrimination simply must be with respect to terms, conditions, or privileges of employment. And a term, condition, or privilege of employment is a workplace requirement or benefit that an employer imposes on, grants to, or withholds from an employee. So any discriminatory prohibition on job duties violates Title VII because the tasks an employee is assigned are job requirements that an employer may not dole out in a discriminatory fashion. Do you want to talk about sexual harassment? Yes. So, turning to Ms. Wallace's hostile work environment claim, performance created and was the victim of severe, pervasive, unwelcome harassment. What's your best case, best cited case in support of you? Because we have a lot of cases where people did a lot of things that were rude and none of us would want to put up with, but the thing is, Title VII doesn't just teach people to be polite. It's a little more difficult than that to prevail. So can you tell me, what is the best cited case in your favor to show that your client was subject to a hostile work environment? I'd point the court to the recent decision in Abbott, which we cite in our 28J letter, and also to the court's decision in Sharp. And here, the district court held that a reasonable jury could find that performance subjected Wallace to severe or pervasive harassment. Can you discuss some of that? Because I guess our en banc case in Bow Brothers would tell what the scope of that was. So tell us what the scope of the harassment was. So here, Casey, Wallace's supervisor, used the obscene language that I mentioned at the top about Wallace's body to humiliate and degrade her in front of her colleagues and supervisors, that's ROA 467, and that occurred at weekly safety meetings in front of her colleagues and supervisors, and at least three times a week, if not daily. And in June and July 2017, Taro, another supervisor, sent Wallace a photograph of his genitals and solicited a photo of Wallace's chest and then repeatedly asked to touch her breasts. And this is a supervisor? That's right. And that's at ROA 475 through 76. And around the same time... And she did tell some other supervisor this? She eventually told Tapley about Taro's harassment, but she was at first so shocked that she rejected his advances, and he tells her later, acknowledging her rejection of his advances, that it, quote, took guts to send the photo of his genitals to her. She... Do you have a quid pro quo case against that supervisor, or is it just an overall hostile work environment claim? We're pursuing the overall hostile work environment claim that takes into account Taro's conduct, Casey's conduct, and also La Prairie's conduct, although I do see your point because Taro did eventually suspend Ms. Wallace, and there appears to be a connection between his harassment and that suspension. But I do want to mention Mr. La Prairie's harassment when he tells Ms. Wallace that she's, quote, in her sexual prime, and he grabbed her from behind to massage her without her consent. That's at ROA 479. But on that one, you know, they investigated it, and while they were investigating it, he left. What were they supposed to do differently once he quit? Because the most they could have done is fired him, right? So I think that it would be a mistake to take his conduct separately from the entire environment of harassment that occurred here. So the... If they're trying to fix it, why does it count? In other words, it's reported that he did this, they're investigating that, which they should do, and they have the right to do, and while they're investigating it, he quits. So they stop the investigation. I'm just trying to understand why that should count against them. So I don't think it counts against them, but there is evidence in the record that they did not respond to the atmosphere of harassment, and that's because they don't take any action to discipline any of the harassers, and in fact, Ms. Wallace continues to experience the harassment even when upper management knew or should have known about the open and pervasive harassment, and the atmosphere of harassment went all the way to the top. The construction manager who oversaw the entire project repeated in casual conversation that he didn't care for women on his projects, and one of the other ways that we know that performance did not respond to the harassment is that, again, Casey continued to prohibit Wallace from working at Elevation and relying on his obscene rationale, and then a jury could conclude that Wallace was actually punished for opposing the misconduct, and I'd point the court to the retaliation section of our brief, which describes how a jury could conclude that Wallace was demoted, suspended, and discharged because she engaged in protected opposition activity. Now, I see that my time is coming to a close, so if there are no further questions, I'll reserve the remainder of my time. You've saved time for rebuttal. Thank you, counsel. We'll hear from the EEOC as amicus next. Good morning, your honors, and may it please the court, Nick Sansone on behalf of the EEOC. The district court erred on all three of Ms. Wallace's Title VII claims, so unless the court wishes to focus on any one of them, I'll briefly address each. First, the district court was wrong that no jury could find actionable sex discrimination here. In crude, explicitly sex-based terms, performance refused to let Ms. Wallace do any work in the elevated racks at her construction site. And to your point, Judge Elrod, we agree that a jury could find this refusal sufficiently ultimate to be actionable under this court's existing precedents. The quintessential function of Ms. Wallace's helper job was to assist skilled construction workers. Can you talk about whether they've established the Eller-Ferger defense in the sexual harassment context, please? Certainly, your honor. So, firstly, with respect to the supervisory harassment, and that is Mr. Casey and Mr. Tarrow's conduct, performance bears the burden of establishing that it is not liable. And if that harassment is connected to a tangible employment action, then performance is strictly liable and that defense is not available. And both supervisors' harassment was connected, a reasonable jury could find, to a tangible employment action. As for Mr. Casey, a jury— Was it connected to the termination? Mr. Casey's—we have argued that Mr. Casey's harassment, the daily stream of crude language, was connected to the de facto demotion that we discuss more fulsomely in connection with the discrimination claim. And as for Mr. Tarrow, he is the one who did sign off on Ms. Wallace's suspension and termination just weeks after Ms. Wallace rejected his repeated explicit sexual propositions and his demand that she reciprocate an obscene photograph. But even if no reasonable juror could find a causal connection between the harassment and either of these employment actions— You've done that, right? Ms. Wallace did report Mr. Tarrow's conduct to her direct supervisor. How could he possibly be the person allowed to sign the form for her? Even if you didn't want to really fix the problem, why would you let that be the guy that signs the termination paperwork and leads to it? We absolutely agree with that point. Even however, if no reasonable jury could agree with it— Did you consider that her direct boss was her husband in this analysis? Performance has cited no case that would make that relevant. It was Performance's decision to make their working relationship—to structure their working relationship that way, and he was her direct supervisor. So it made sense that he was the person to whom she turned to report that conduct. So what's your response to Judge Elrod? So as for the Farragher-Ellerth defense, even if no reasonable jury could find a connection to those tangible employment actions, it then becomes Performance's burden to demonstrate that every reasonable jury would have to conclude both that Performance took reasonable anti-harassment measures and that Ms. Wallace unreasonably failed to avoid harm. And the evidence leaves ample room for a jury to doubt Performance has carried its burden on both points. As for the anti-harassment measures, there's no evidence that it took any beyond putting a policy in its employee handbook. To go to your point, Judge Haynes, about the La Prairie investigation when Human Resources was notified about his conduct, it's true that Mr. Gautreaux testified that there was an investigation, but it's worth noting that that incident is alleged to have happened in June 2017, and Mr. La Prairie left of his own accord to pursue more lucrative work on July 22nd, 2017. So depending on when that... It doesn't seem that long to me. I mean, I realize that if you're the one being subject to this kind of conduct, you want things to happen really fast, but an employer wants to fully investigate. I'm certainly not saying that Ms. Wallace lied, but that can happen. And so they're investigating and so forth, and then this guy leaves, I guess it's within about a month. I... Is that... I mean, does that count against them? That's my question. I... Your Honor, I wouldn't say it counts against them, except in the sense that it is their affirmative defense that they have to prove to the satisfaction of a jury. And if I may finish my answer, I see that my time has expired. As Your Honor points out, it was a span of a minimum of three weeks, and other than a vague reference to investigation, performance has presented no evidence of what that performance looked like, any concrete steps that human resources took, or anybody it spoke with. So a reasonable jury could doubt from that lack of evidence that performance has carried its course. So I mean... So there's some... Is there some issue that whether they're even doing an investigation? Is that what you're saying? It's a fact issue on whether there was an investigation. That's exactly right. They've put forward no evidence, other than a vague allusion to an investigation, that there were any further steps taken. And there was just a... And we... The investigation wouldn't be over when the one person leaves, if it's about all of the things, right? That's correct. That's correct. So unless... Let me ask you one thing. I know it's time now, but some of the cases talk about an employer having a defense that the termination would have occurred anyway, despite the conduct. Is that still a defense? To the extent that it is, performance hasn't raised that defense, and under Title VII... It was an egregious absence that she had. They have raised that. They've raised that as a... In terms of the causation for the retaliation claim, we haven't taken an issue... Excuse me. We have not taken a position on the cause piece for the retaliation claim. But there can be... But Supreme Court precedent is clear that there can be multiple but-for causes. So even if the retaliation or the harassment wasn't the sole cause, as long as it was a but-for cause, in the sense that it wouldn't have occurred but for the illicit factor, then liability still attaches. All that would be for the jury to work out. That's your position. All that would be for the jury to work out. That's exactly right. Did the plaintiff in this case argue that part of her absences are because she's under this terrible day-to-day pressure, being harassed in this manner? That her absences were due in part to that? Or did she not argue that? Or do you not know? As I say, that isn't something that we as the EEOC have taken a position on. But we certainly do... I'm just wondering if she argued that. I don't know if there's a fact issue on that. The EEOC didn't rule for her, did they? We did not issue a cause determination. But the failure to issue a cause determination doesn't equate to a determination that no violation occurred. It just means that based on a preliminary investigation, we didn't take up the case. Thank you. We have your arguments. Thank you. We'll hear from performance contractors. Good morning. Murphy Foster on behalf of performance contractors. Correct. There was a no cause determination in this matter. What do you mean, no cause determination in this matter? Well, when the EEOC gets a charge, they have three choices. They can find that there's reason to believe that the allegations have merit. But they cannot find a no cause. They cannot find that the allegations have merit. Or they could administratively dismiss after 180 days at the request of the plaintiff. So this was what we call a no cause. But that has no bearing, right? That doesn't mean that the EEOC found the case to be good or bad or anything of the sort, does it? It is not a determination. It is simply a lack of finding. They could not find that there was evidence to support the allegation. But that's not... That's not whether we find there was evidence in any way. That's not. You're absolutely free to, whether it's a cause or no cause determination, to find what you think is true. I'd like to begin by addressing Judge Haynes' first comment. What about the safety issue? I think what the government and the appellant miss is the nature of this work. It's industrial construction. It's reported to be one of the most dangerous types of construction in America today. In this case, prior to being hired by performance contractors in 2017 as a helper, the entire extent of Miss Wallace's experience in the construction-related industry is one month. She worked for a company called Sun Midstream. She said in her application she worked there for four months. We learned that she lied. We got certified job records, and she only worked for one month, from August 1st to September 1st, 2016. When did you learn that, and was that a basis of determination? No, it wasn't. It was something that didn't come up. We didn't discover it until after this whole suit came up. Yeah, so that wasn't why she wasn't up on the thing. No, but why she wasn't up on the racks. Let me explain what working at Elevation is. In this case, performance contractor is a pipe contractor. They build chemical plants and refineries. Elevated pipes run throughout the plant. Once they get to a certain point, those elevated pipes are supported by walkways, catwalks. Here, this was early enough in the project, there were no catwalks. This woman had never, she never suggested in her application that she had ever worked at Elevation. She worked one month in the construction industry. Prior to that, she was in banking and finance, and stuff has nothing to do with construction. And we know she didn't work there for four months. She worked there for one month as a helper. She never suggested in her application she ever worked at Elevation. Elevation here, what she was asking to do, was to be able to climb up into the pipe racks and bring water to welders. She's not a welder, she's not a fitter, she's not a boiler maker. She's got no business in the racks except to support those that are up there. But the supervisor didn't say you lack experience. He says you have, what he would say, crude female body parts. It was not because, well, you need to have some classes or training. It was that you have female anatomy, in a most crude way to put it. Well, no, I can think of other crude ways, unfortunately. That, indeed, is the allegation. But the facts of the matter are, she was a ground worker at that point. She worked on the ground, as many, most helpers do. But is your point that even if he wasn't being crude, she still shouldn't have been up there? I mean, in other words, she didn't suffer as a result of being a woman. She suffered from lack of experience. Is that true? That's exactly right. But is that a fact question? No training, no experience whatsoever with the Sun Company or with performance. Never been in the racks. Why isn't that a fact question? If she wasn't up there because she was a woman or she wasn't up there because she lacked experience that other people who were up there had. But she could point to no comparator, no man, with her lack of experience. She doesn't have to have a comparator in a direct evidence case. This is a direct evidence Title VII case. You need a comparator when you do the McDonnell-Douglas analysis. Here, you do not need a comparator. She does not need a comparator with regard to direct evidence. That is correct. But what we're talking about is whether or not she's qualified to work in the racks and whether or not we treated men differently than we treated women. We did not. She could point to no man. They didn't say they had Ts and As. The T and A comment is a crude comment. Made repeatedly throughout numerous meetings every time. That's what she said. Yes, and that's the fact. We weren't there. We have to go on the record. I understand that. But is using the term T and A egregious enough? Is it severe and pervasive enough to rise to the level of a hostile environment? Well, that's a separate question to me from the direct discrimination question because you can discriminate without, you know, making rude comments. You can just say, I'm not going to let you do this because you are a woman. That would be discrimination without it being, you know, the kind of hostility of grabbing someone and all of that. So those are two separate issues in this case. I mean, all of it's related, I understand, but they're two separate issues. So we're dealing with the direct issue, and I'm just kind of trying to figure out their argument is the safety, and I realize if she'd gone up there and fallen and died, we would have a different case pending before us. That happened. And I know that you said that did happen, and I think that's very serious. But I'm wondering, is it just a fact question, that, and how are companies supposed to deal with that if they aren't able to? Because the problem is this notion that women can't do as well as men and whatever. That's been going on for decades, you know, in the Army and this and that, and so it's, you know, on and on and on. And the fact is if you think women can't lift weights and you need people to lift weights, then just make a rule. You've got to be able to lift 50 pounds. So if a man can't do it, he can't. He's not available. If a woman can't do it, she's not available. But if she can, which some women can, so be it. But there's no evidence in the record that performance did not allow women or had a blanket rule that women could not work. But they didn't have any women besides her. No, on this particular job at this particular point in time. Was she the only woman there, though? No, she wasn't the only woman there. But she was the only woman in that particular situation that was asking to work in the mission. And they said we're not going to let you do it because you're a woman. And they later said that's because of the scissors. That's what Casey said. But if you dig deeper, Gautreaux, Casey's boss, cut a deal with her. He let her go up in the scissor lift, which is not climbing in the racks. The racks are not a jungle gym. They are a dangerous place to be. How high is it? Sir? How high is it? Anywhere from 15 feet to 50 feet at different levels of pipes. As the situation was staged at the time, what would she have to walk on at that point? Pipes. She wouldn't have – there was no walkway. Do you remember the discussion about the catwalks and whether or not the grating was down, the grating wasn't down? Four-inch pipes or what? Some four-inch, some six-inch pipes, but mainly four-inch pipes. She would have been balancing, walking, tiptoeing around pipes at elevation, presumably with a safety harness on. Now, regarding the safety harness, the testimony is that we didn't have a safety harness to fit her at the time, but one eventually was provided. Okay. When that was provided, was she allowed up there? No. Okay. Well, then that's the problem. To me, I really respect the safety issue. I don't want to cause her or anybody else to die from the safety problem. But that said, if you have someone who comes who's too small, man or woman, and you have to go get them the harness and you go get that, then they should be allowed up there, right? Remember the testimony from Mr. Gautreaux. Mr. Gautreaux was the area manager. He addressed this issue because she wanted to work in the racks. And he said, all right, I'm going to let you go up in the scissor lift a couple of times, and when we get the grading down, when we get the flooring down on the racks, I'll let you go up there. I'll let you start going up. That was a compromise that she agreed to, and I don't have it in the record right now because I'm out of it, but it's in the record, that that was a compromise that she – Why not have a jury trial on this? I mean, you have some good arguments. I guess I'm – Oh, I do. Why is this a summary judgment? Well, we like to get a summary judgment, and we think a summary judgment – Well, I mean, I know why your client wants the summary judgment, but I just am like, these are some good arguments, but they have some good arguments. Why isn't that what jury trials are all about? Well, let's look at why she was terminated. I mean, ultimately, there's a number of issues, but one of the issues ultimately is, well, why is she terminated? She was terminated. She didn't quit. Isn't that a pivot? It is. We're dealing with emotion, and now we're dealing – Oh, you're just turning to a different subject. I'm just trying to – Fair enough. You're pivoting. That's okay. Pivot. Yes, ma'am. I'm trying to hit all my points.  she was either late, left early, or absent. She failed to come to work at least more than one out of every 10 days. Did she call in properly, or is that an issue, too? No, no, no, especially the last one, the last one that resulted in her suspension and her husband's termination. They both missed the same day, no call, no show. Husband fired. The plaintiff, Ms. Wallace, was suspended. She was told to come in the next day after her suspension was over. Guess what? No call, no show. She suggests that she wrote a letter at some point in time saying, I'm not coming back. We never got it. There's no evidence it was ever written, except she said she wrote one at some point in time. Doesn't that create a fact issue? I don't think so. Well, why not? Isn't that her evidence, and then you have your evidence? They produced no evidence that she resigned. Well, her testimony says she resigned. You don't have to have a written resignation is your point, right? What's that? Your point is I can't just write a resignation and put it in my drawer. I have to send it for it to be a resignation. Of course. And for us, for performance, they had a suspension for no call, no show, and a horrible track record for attendance, and then she's a no call, no show, and the next day she's supposed to come to work. What are they supposed to do? Wait around for a letter saying I resigned? No. They fired her, and they should have fired her. She was a marginal employee with very little experience, seeking to do something she wasn't qualified for that was deadly. So why is the worst sexual harasser allegedly, and you concede that that event happened with the genitals and all, don't you? You know, Taro didn't testify. Taro wasn't available to deny it. She said it happened. Interestingly enough, she invited Mr. Taro to her husband's birthday party a month later, so she couldn't have been too outraged by it. Okay. No, that's not the question. The question is, assuming arguendo that that did in fact happen, why would that person be the person signing off on all the terminations? Because she didn't report it. Within a month. Why wouldn't somebody, why wouldn't the company of someone else deal with her other than the person who was allegedly grabbing her breast and sending his pictures of his genitals to her within a month and a half? That seems very unusual for an employment, is it an experienced employment lawyer? That would seem very unusual. I don't think there's any evidence that he ever grabbed her breast. I think she says he did. No, I haven't seen it. Asked to grab her breast. Oh, he asked to see her breast. He grabbed her breast. He asked to see her breast, as I appreciate it, in response to the genital picture. Yeah. So you ask why would he be allowed to sign? Because we have a policy that is robust, actively enforced, and she did not report it. How do we know that Tarot did that? If my secretary comes to me and says that somebody sent her one of these pictures from my office, I don't let them talk to each other anymore. That's why we have policies so that an employer can know. The employer had no clue that Tarot had done this. This is his big deal. This is the thing that Tarot is alleged to have done. And we're in the dark. At this point, we don't know anything about this. And he was the person who typically and appropriately would sign the suspension and the termination. We didn't know about this genital picture, if, in fact, it exists. By the way, we've never seen it, never produced. Well, it says she did report it to her other supervisor. Well, she reported it to her husband, is what they say. But who is her other supervisor? Interestingly enough. And that that supervisor contacted Human Resources and didn't get a call back. That's the fact issue on that. The supervisor she allegedly reported it to was her husband. Yes. Okay? You set it up that way. I can go on about what a stupid decision it was to let her husband be a supervisor. But, you know, you understand why she was hired in the first place. Husband had a terrible attendance record also. We thought, the performance thought, by letting his girlfriend, wife, come to work for him, he'd come to work. And so. Lesson learned, I guess. What's that? Lesson learned that if you have a problem with someone, having them supervise their spouse is not really the answer to the problem. But that's the person she supposedly reported the genital pic to, and he never reported it. He never reported anything. She never reported anything except the La Prairie comment, which we investigated. And the evidence is clear that there was an investigation and that La Prairie resigned during the investigation. There's no dispute with regard to that. They could speculate and say, well, it must not have been much of an investigation. It was enough of an investigation, it scared him off to quit. How long do these kinds of investigations usually take? You know, you'd like them to be over in a week or two, but they can last. You're talking about firing somebody, somebody at. So you want to be sure. You want to make sure you're doing the right thing. And this person was not the most credible person on the job site. But I'm just trying to understand, once he resigned, was there any other discipline you could take on him? No. Your worst discipline would have been to fire him, but instead he resigned. That's right. When we're saying you, obviously we're talking about your client. I understand. At the point where Ms. Wallace was allowed to go up, did you have the scaffolding laid in? No, sir. The only time that she was allowed at elevation was Mr. Gautreaux allowed her to go up in the scissor lift on two occasions. She didn't get out and walk around. She stayed in the scissor lift. It goes up, comes down. It's graded. It's got iron all around it, and you're tethered into it. And after that happened, didn't one of the supervisors say, don't ever let her do that again? Isn't that a factual allegation? Mr. Faraci said at some point in time, and I'm not certain exactly when that was, that he didn't want her working at heights. Because he didn't want any women working at heights. That was the allegation. That's the allegation. That is correct. And as a factual matter, there's no proof that that never happened, that women didn't work at elevation. Well, proof is, yeah, it's somebody's testimony. Someone's testimony is proof. I recognize that, but nobody ever said women never worked at heights. It's just in this particular section of this particular job. You're saying across the board at PC? Across the board at PC. There's 1,600 employees out there. But you all didn't put on evidence of women at elevation. There is no evidence of women at elevation. There is no evidence of women not at elevation except for this particular place. Okay, so then this is all we've got. That's all you've got. That's right. Is this your position that the harassment, if we were to take it as true, is not severe or pervasive? Is that your position? Yes, ma'am. Is that your position, really? It is my position that the harassment that is alleged is not severe and pervasive based on this- What's your best case for that? Because we have a lot of cases with a lot of rude stuff that we've said wasn't a job. Gibson v. Potter, male supervisor sex talk. Sorry, say it again. Gibson v. Potter, 264-397. Male supervisor sex talk request for dates and female employee offer of his telephone number together with a single- That's unpublished. What's your best published opinion? Shepherd v. Controller of Public Accounts for the State of Texas. That particular said that her elbows were the same color as her nipples. She had big thighs by licking up her dress, attempted to lick down her clothing, touching plaintiff's arm on several occasions, suggesting that plaintiff sit on his lap. Burnett v. Tyco, lifted up the plaintiff's tank top and bra strap and placed a pack of cigarettes and lighter under it, told the plaintiff, he was giving her a cough drop, since you lost your cherry, here's one to replace it, and sung Deck the Malls, Deck the Malls, Almost Got Aroused when singing Deck the Halls Christmas Story. This is nowhere near that type of thing. This is not severe and it is not pervasive. The evidence does not support a severe and pervasive finding. In the 11 seconds I have left, if you would like me to address the Cheney test, the Cheney case out of the D.C. Circuit, I'd be happy to do it. I don't think this is a transfer case, as the Cheney case was. This is not a transfer. She was doing all, everything she did was within her job description. She didn't, she wasn't asked to do anything outside of her job description. I'm out of time. Thanks. Thank you. We have your argument, counsel. I want to address the purported safety rationale, because first, viewing the facts in Wallace's favor, this safety rationale is just further evidence of discriminatory motive, and that's because it's been well recognized for decades that employment decisions cannot be predicated on mere stereotyped impressions about characteristics of males and females, and I'm quoting from the Supreme Court's decision in City of L.A., Department of Water and Power. And here, we know that men can also suffer injuries when working at elevation, but the reason that Ms. Wallace was not prohibited to, was prohibited from working at elevation is because, quote, females stay on the ground, and that's at ROA 469 through 470. And we also know that the purported safety rationale simply makes no sense, because Wallace was infrequently permitted to work on a scissor lift in a harness, but only after her supervisor, Casey, was sure that her husband did not have a problem with how her body looked in a harness, and that's at ROA 468. And she also was not permitted to work in a harness at elevation even after dance floors were installed. In other words, there's no safety issue with the harness, because we know that Ms. Wallace was capable of doing the job, and she was still prohibited from doing the job even after the dance floors were installed. So the gist of performance's argument here is that it could hang a sign in the workplace that says, women stay on the ground, or women do not count in the construction industry, or women cannot access the on-the-job training that men in the same roles are entitled to, and that Title VII would have nothing to say about this discrimination. But this is discrimination that is within the heartland of what Title VII was designed to protect against, and nothing in this court's precedent requires holding otherwise. So we therefore ask that the court reverse the district court's decision and remand for trial. Thank you. You agree that when she was allowed to go up, she stayed in the lift and didn't get out on the pipe? She was working on the scissor lift when she was allowed to work in a harness. But again, we have the direct evidence, the myriad direct evidence, that the reason she was prohibited from working at elevation was based on sex and not based on a safety rationale. Do you want to address her lack of attendance? Sure, Your Honor. So I think her attendance records are not relevant because performance did not follow its progressive three-strike discipline policy. It gave her a verbal warning, a written warning, and the suspension on the same day, despite its policy requiring that it give a verbal warning and then a written warning ahead of a suspension. And also, to your point earlier, Judge Elrod, there is evidence in the record that her absences were based on the environment of harassment that she was experiencing. Don't you still have to report? If you're going to the doctor, you still have to say, you know, I'm going to the doctor or I need to take the day off for medical treatment or whatever. Yes. You don't just not show up. Yes. Unless you're in a car accident and, you know. And performance would have been entitled to. Conscious. Discipline her under its progressive three-strike discipline policy, which it didn't follow. But we said repeatedly we don't have to follow their. I mean, they can have these rules, but that doesn't mean that they have to follow them. That's right, Your Honor. But from the fact that they failed to follow this discipline policy, a jury could conclude that the absenteeism was a pretextual reason and that the real reason for the suspension was the harassment and discrimination and retaliation. Thank you. This case is submitted.